**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No.: 1:21-cr-00682-TFH** |
| | : | |
| **PHILIP JAMES WEISBECKER,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Philip James Weisbecker ("Weisbecker") to a split sentence of 90 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution.

**I.     Introduction**

The defendant, Philip James Weisbecker, is the owner of Weisbecker Consulting Services, which provides business management and estimating services for commercial and private development companies, general contractors, marine contractors, subcontractors, architects, engineers, and owners. ECF No. 30 at ¶ 94. Weisbecker participated in the January 6, 2021 attack on the United States Capitol ("U.S. Capitol" or "the Capitol") — a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than 2.7 million dollars' in losses.[1]

---

[1] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

On March 3, 2022, Weisbecker pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building.  As explained herein, a sentence of 90 days' imprisonment and 36 months' probation is appropriate in this case because Weisbecker: (1) unlawfully entered the Capitol after  watching rioters climb the scaffolding set up for the inauguration and law enforcement officers deploy tear gas to disperse rioters; (2)  penetrated the Capitol all the way to the Speaker's suite of offices,  a highly sensitive area of the Capitol Building; (3) wandered through hallways and into the Rotunda where he took photographs of himself; (4) posted video and photographs on social media which demonstrated a total lack of remorse; and   (5) verbally abused law enforcement officials who stopped and questioned him about January 6 and his post-guilty plea verbally abusive conduct towards transportation officials he believed harassed him demonstrated Weisbecker's contempt for public officials.

The Court must also consider that Weisbecker's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed to disrupt the Congressional certification proceedings.  Here, Weisbecker's participation in a riot that actually succeeded in halting the Congressional certification combined with his entry into a sensitive area, lack of remorse, and lack of control when confronted by law enforcement officials demonstrates 90 days' incarceration, 36 months' probation, 60 hours of community service, and $500 in restitution is both necessary and appropriate in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 27 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to Weisbecker's conduct and behavior on January 6.

### *Philip James Weisbecker Role in the January 6, 2021 Attack on the Capitol*

Weisbecker lives in Dulzura, California ECF No. 30 at 2.  On January 6, 2021, he traveled to Washington, D.C. from San Diego, California to attend the "Stop the Steal" rally. ECF No. 30 at ¶¶ 19-20.  Weisbecker attended the rally and then marched with other protesters to the Capitol. *Id.* at ¶ 20.

At approximately 2:22 p.m., Weisbecker was on restricted U.S. Capitol grounds when he saw law enforcement officers deploy tear gas into the crowd as rioters climbed scaffolding that had been set up for the inauguration of President-elect Biden. ECF No. 30 at ¶ 20.  Weisbecker videotaped the rioters as they climbed the scaffolding.  *Id.* Between 2:22 p.m. and 2:24 p.m., Weisbecker entered the U.S. Capitol through the Senate Wing Door. *Id.* at ¶ 21.  Weisbecker entered the U.S. Capitol approximately twenty to twenty-two minutes after the door was initially breached.



Figure 1 – Weisbecker entering the U.S. Capitol through the Senate Wing Doors.

Weisbecker then walked upstairs and entered the suite of offices assigned to the Speaker of the United States House of Representatives ("Speaker's suite of offices") and remained in an area where administrative cubicles/desks are located. ECF No. 30 at ¶ 22.  During this time, some of the Speaker's staffers were sheltered fearfully in their offices while rioters were in the area.  *See* https://www.cnn.com/videos/politics/2021/06/20/capitol-hill-riot-doc-invs-pelosi-staffers.cnn (last viewed June 18, 2022).  When questioned during a secondary inspection on March 3, 2021 by Customs and Border Patrol ("CBP") agents about January 6, 2021, Weisbecker admitted that he entered the Speaker's suite of offices and specified that because there were so many protesters in the area he went into one of the administrative cubicles/desks.  *Id.* at ¶ 49.  Weisbecker said he left the area when someone shouted, "SWAT!"



Figure 2 – Still image of Weisbecker leaving the Speaker's suite of offices. https://www.youtube.com/watch?v=UBp42536IhE (video last viewed June 5, 2022).

Weisbecker then paraded with other protestors throughout other areas in the Capitol, including the Statuary Hall Connector, Statuary Hall, and the Rotunda where he stayed until approximately 3:15 p.m. when law enforcement officers removed Weisbecker and other protesters from the Capitol.  *Id.* at ¶ 22.



Figure 3 – Weisbecker in the Statuary Hall Connector area. Note: Time stamps reflect Universal Time Coordinated ("UTC") time, which is the standard used around the world and is 5 hours ahead of Eastern Standard Time.



Figure 4 – Weisbecker in Statuary Hall.



Figure 5 – Weisbecker in the House of Representative Hallway.



Figure 6 – Weisbecker in the Rotunda.



Figure 7 – Weisbecker at the Rotunda Door Interior.



Figure 8 – Weisbecker exiting the Rotunda Door Interior.

*Social Media Posts*

Throughout Weisbecker's time unlawfully inside the Capitol, he used his Nokia cellphone and Cannon Rebel camera to take photographs and video. Between January 6 and March 18, 2021, Weisbecker posted photographs and videos on his website and Facebook page, including photographs of protestors on scaffolding set up for the inauguration and a photographic slideshow that included a photograph of himself standing in the Capitol, right thumb up and right pinky finger extended, with a caption on the bottom that stated, "All in the name of Freedom for it is not free …." ECF No. 30 at ¶ 23; *see also* ECF No. 1-1 (supporting Statement of Facts displaying Weisbecker social media post and still images).



Figure 9 – Still image from video of protestors on scaffolding posted by Weisbecker to Facebook.



Figure 10 – still image from video of protestors on restricted grounds posted by Weisbecker to Facebook.



Figure 11 – Weisbecker "selfie" from slideshow posted by Weisbecker to Facebook.



Figure 12 – Still image from video of protestors at rally posted by Weisbecker to Facebook.



Figure 13 - Still image from video of protestors on restricted grounds posted by Weisbecker to Facebook.



Figure 14 - Still image from video of protestors inside the Rotunda posted by Weisbecker to Facebook.



Figure 15 – Still image from video of protestors inside the Rotunda posted by Weisbecker to Facebook.



Figure 16 – Still image from video of protestors on restricted grounds posted by Weisbecker to Facebook.



Figure 17 – Still image from video of protestors on restricted grounds with an explosion animation effect posted by Weisbecker to Facebook.

On March 26, 2020, years after Facebook had banned Weisbecker from its platform, it allowed Weisbecker to create a new account. *Id.* at ¶¶ 52, 54. Once back on the platform, Weisbecker wrote posts on various topics, ranging from politics to conspiracy theories. *Id.* at ¶ 54. After January 6, 2021, Weisbecker posted numerous posts and/or videos indicating he was

13

inside the U.S. Capitol Building on January 6, 2021 and also attacks on those he regarded as his political opponents, including Antifa, BLM, Communists, Liberals, and "the Left." *Id.* at ¶¶ 53-54, 59.  Weisbecker also posted a series of videos on Facebook, which still images are contained in the Statement of Facts filed in support of the Complaint.  ECF No. 30 at ¶¶ 55-58; *see also* ECF No. 1-1.

*Weisbecker's Encounter with Customs Border Patrol Officers*

On February 7, 2021; February 10, 2021; February 23, 2021; and March 3, 2021, United States Customs and Border Patrol (CBP) officers at the Tecate Port of Entry at the Baja, California and Mexico borders stopped Weisbecker to conduct secondary inspections. During the inspections, they questioned Weisbecker about the events on January 6, 2021.  ECF No. 20 at ¶ 24.     During the February 7, 2021 secondary inspection CBP officers asked Weisbecker about the events on January 6, 2021. Weisbecker responded that he was a "citizen journalist" and wanted to document "what really happened."  *Id.* at ¶ 36.  Weisbecker also admitted he entered the Speaker's suite of offices.  *Id.*

During the February 10 stop Weisbecker referred to the CBP officers as "communist," "gays," and stated they "enjoyed patting him down."  *Id.* at 37.  Weisbecker referred to the CBP officer-in-charge as "stupid," a "cock sucker," and a "communist pig."  *Id.*  Regarding the Capitol riots, Weisbecker stated: (1) he traveled to Washington, D.C. to see events firsthand and (2) President Biden was not a legitimate president.

During the February 23 stop CBP officers conducted a border search of Weisbecker's phone and discovered several photographs of Weisbecker at the January 6 protest and in the Capitol.  *Id.* at ¶¶ 45-47.

During the March 3 stop, Weisbecker told the CBP officers that he was tired of being referred to for secondary screening. *Id.* at ¶¶ 48-49.  Weisbecker referred to the CBP officer-in-charge as a "fascist" and "communist."  *Id.* at ¶ 49.  Weisbecker reiterated his February 10 assertion that President Biden was not the real president and further stated many states had committed election fraud, and that he was at the Capitol to make sure the voice of the American people was heard.  *Id.* at ¶ 49.  Weisbecker admitted, once more, that he entered the Speaker's suite of offices. Additionally, Weisbecker stated that it was a peaceful protest. *Id.* at ¶ 49.  He claimed any property damage to the Capitol was caused by Antifa.  *Id.* Weisbecker blamed Antifa for what he characterized as a "false flag" and that he and other "American Patriots" were there to tell United States Senators to "do the right thing." *Id.*   When a CBP officer asked Weisbecker if he realized that it was illegal to enter the Capitol, Weisbecker stated that he followed everyone else and that he had not flown to Washington, D.C., to watch from afar.  *Id.* Weisbecker further stated that he made a "bad mistake" when he entered the Capitol, but it was the only way to know what happened. *Id.* Regarding the protest, Weisbecker stated that none of the protesters had weapons or guns or attacked the police. *Id.*  Further, Weisbecker stated that he did not know why the police fired rubber bullets or used tear gas against the protesters. *Id.*

*Weisbecker's Interview*

After waiving his *Miranda* rights following his arrest, Weisbecker told the agents that he viewed the rally as a political Woodstock.   Refusing to express any remorse for entering the Capitol, he identified himself as a "peaceful protestor" who did "nothing wrong."  He admitted he entered the Capitol and the Speaker's Suite on January 6.  ECF No. 30 at ¶ *26.*  Weisbecker also told the agents that he posted photographs before, during, and after he entered the Capitol on his website.  *Id.*

*The Charges and Plea Agreement*

The government filed a four-count Information on November 8, 2021, charging Weisbecker with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). ECF No. 14.  On March 3, 2021, Weisbecker pleaded guilty to Count Four of the Information, which charged him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. By plea agreement, Weisbecker agreed to pay $500 in restitution to the Department of the Treasury.

*Weisbecker's Post Guilty Plea Conduct*

On April 25, 2022, Weisbecker was at the San Diego International Airport when TSA officials selected him for enhanced screening.  *Id.* Weisbecker became belligerent and referred to the TSA officials as "monkeys."  During the pat-down inspection, Weisbecker directed a raised middle finger towards an unknown person and screamed "Fuck you!" multiple times, which distracted the inspecting officer and caused him to restart the pat-down.  Weisbecker also hurled obscenities at the inspecting TSA official, which included: (1) "Fuck you Barney," (2) "Fuuuuuuuk you, man," (3) "Eat a bowl of dicks," (4) "You're so gay," and (5) "Suck a dick."  The inspecting TSA official requested that Weisbecker sit down so the official could screen the bottom of his shoes.  Weisbecker objected and questioned the official on why he was selected for screening. After Weisbecker sat down, the official attempted to conduct the pat-down to check the bottom of Weisbecker's shoes and Weisbecker raised his foot in such a way that on two occasions, he almost kicked the official.  ECF No. 30 at ¶ 10.

### III.   Statutory Penalties

Weisbecker now faces sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, Weisbecker faces

up to six months of imprisonment and a fine of up to $5,000. Weisbecker must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors weigh in favor of a split sentence of 90 days' incarceration and a term of 36 months' probation.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the

17

throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at Weisbecker's individual conduct and history, this Court should look to a spectrum of aggravating and mitigating factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; (9) whether the defendant demonstrated  sincere remorse or contrition; and the defendant's conduct after January 6, 2021. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had Weisbecker personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on his part is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish him from most other misdemeanor defendants.

Weisbecker must have witnessed law enforcement officers struggling to maintain control, but he wanted to enter the Capitol on January 6 because, as he told CBP officers on March 3, he did not fly to Washington, D.C., to watch events from afar.  ECF No. 30 at ¶ 49.  That is why instead of turning back when he saw law enforcement officers deploy tear gas to quell the ongoing rioting, he forged ahead to the Capitol, taking photos and video along the way of other protestors

18

unlawfully entering the Capitol and scaling the scaffolding set up for the inauguration.  Weisbecker entered the Senate Wing Door among a throng of protestors approximately twenty to twenty-two minutes after the Capitol was first breached and the United States Secret Service advised the Vice-President to evacuate.    Some rioters entered as Weisbecker did through the breached door and other rioters had entered through broken Senate Wing windows to Weisbecker's left and right. This, however, did not deter him.  Weisbecker did not turn back or attempt to leave.  Instead, he went to the Speaker's suite of offices, a sensitive area targeted by the mob of rioters, some of whom threatened the Speaker and her staff with violence.  Weisbecker stayed in this sensitive area until another protestor shouted, "SWAT!"  Weisbecker did not leave the Capitol at that time either. He then strode throughout restricted corridors and into Statuary Hall and the Rotunda where he stayed until removed by law enforcement officers.  Weisbecker remained in the Capitol for almost an hour.

Weisbecker's lack of remorse is exemplified by his celebration of the riotous behavior in a video montage he posted on Facebook.  *See* ECF No. 1-1 at 12-20 (detailing in Statement of Facts still images from Weisbecker's video montage).  He was remorseless during his post-arrest interview, insisting the breach of the Capitol was peaceful but for Antifa.  Moreover, Weisbecker's belligerent post-plea conduct while on pre-trial release is further evidence of his extreme contempt for lawful authority.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Weisbecker's History and Characteristics

As set forth in the PSR, Weisbecker's criminal history consists of a September 19, 1996 misdemeanor arrest that resulted in a conviction, date unknown, for Carrying a Concealed Weapon

in Vehicle.  ECF No. 30 at ¶ 65.  Weisbecker was sentenced to 2 days in jail, suspended, and 36 months' probation.  *Id.*  During Weisbecker's post-arrest statement, he told the agents that the conviction involved a firearm.  On August 9, 2003, Wesibecker was convicted of Driving Under the Influence and sentenced to 30 days jail, suspended, and fined $455.00.   ECF No. 30 at ¶ 66. On April 6, 2021, Weisbecker was convicted in Kauai, Hawaii, of Reckless Driving and Inattentive Driving.  *Id.* at ¶ 67.  Although Weisbecker told the Probation Officer the matter was resolved, a bench warrant remains outstanding.  *Id.*

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of U.S. to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be

made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Weisbecker's post-arrest interview, statements on social media, and post-plea conduct clearly demonstrate the need for specific deterrence for this defendant. Weisbecker celebrated the violence of the day after January 6 by posting a pictures and video of the protestors on the scaffolding and in restricted areas.  He repeatedly asserted on Facebook that the media was lying and downplayed the violence of the day, blaming it on Black Lives Matters and Antifa while falsely claiming those entities and Capitol Police Officers let him inside the Capitol.

Moreover, Weisbecker's appalling and abusive conduct towards CBP officers (referring to the officers or their supervisors as "cock sucker," "a communist pig," "gays") and TSA officers (referring to the agents as "monkeys" and leveling obscenities at them, including telling the agents to "eat a bowl of dicks"), the later after he pleaded guilty in this case, also demonstrates the need for specific deterrence.  Despite knowing national news networks had featured him walking out of the Speaker's suite of offices on January 6, and thus he was suspected of participating in a crime nationally condemned, Weisbecker bristled and verbally abused CBP officers when stopped in February and March 2021.  More significantly, after entering a guilty plea and while on supervision awaiting sentence, Weisbecker continued his verbally abusive conduct when he encountered TSA officials.  This conduct highlights Weisbecker's contempt for law enforcement officials.

Significantly, as of the date of this filing, Weisbecker has not expressed remorse. Indeed, when asked about repentance for his actions on January 6, Weisbecker responded there was none.

ECF No. 30 at ¶ 61.  When interviewed by the FBI at the time of his arrest, he repeatedly and falsely asserted that those who invaded the Capitol on January 6 did not engage in any violence. The government acknowledges that Weisbecker accepted responsibility early by entering into this plea agreement. On the other hand, his failure to acknowledge the dangers and violence of January 6, 2021, his spreading of false propaganda relating to the attack on the Capitol, his lack of remorse, and abusive conduct directed at CBP and TSA personnel underscore the need for specific deterrence in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[3] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[4] Indeed, the government invites

---

[3]  Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants.  That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[4]  Early in this investigation, the government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no

the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have drawn meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

Weisbecker has pleaded guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in the Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar

---

unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

records who have been found guilty of similar conduct," 18 U.S.C.A.   § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long a defendant remained inside, the nature of any statements a defendant made (on social media or otherwise), whether a defendant destroyed evidence of his or her participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, other judges of this court have sentenced Capitol breach defendants who spent time in other sensitive places within the Capitol. A defendant's entry into a sensitive space, such as the Senate Floor or a member's office, places that defendant in a more serious category of offenders than defendants who remained in hallways or central, more public spaces, such as the Rotunda. A defendant who entered a sensitive space took an extra step to occupy the Capitol and displace Congress and to display the dominance of the mob over the will of the people. That person's presence is even more disruptive. An unauthorized individual in a private office poses a greater threat and creates a greater impediment to members of Congress and staffers just trying to do their jobs than would a trespasser passing through a hallway.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-148 (JEB) and 21-cr-467 (JEB), the defendants pled guilty to misdemeanor charges of violating 40 U.S.C. § 5104(e)(2)(D) (disorderly conduct in the Capitol building) in connection with penetrating the Capitol building all the way to the Speaker's Conference Room. Judge Boasberg sentenced each of the defendants to 45 days of incarceration.

In *United States v. Spencer*, 1:21-cr-00147-002 (CKK), the defendant, like Weisbecker, pled guilty to misdemeanor charges of violating 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building) in connection with penetrating the Capitol building, also like Weisbecker, all the way to the Speaker's suite of offices.  Judge Kollar-Kotelly sentenced the defendant to 90 days of incarceration.

The Court may also consider the sentence imposed in in *United States v. Little*, No. 1:21-cr-00315 (RCL). Little, like Weisbecker, pled guilty to violating 40 U.S.C. § 5104(e)(2)(G). Like Weisbecker, Little entered a sensitive area; in his case, it was the Senate Gallery. Little, like

Weisbecker, entered the Capitol despite seeing law enforcement deploying tear gas to quell the riot; entering the Senate Gallery, a sensitive area; taking photographs of himself during the riot; and blaming Antifa and Black Lives Matters for violence at the Capitol. Gov. Sentencing Mem., *Little*, 21-cr-315, ECF No. 31 at 2, 4-6. Judge Lamberth sentenced Little to a split sentence of 60 days' incarceration and 36 months' probation.

In *United States v. Matthew Mazzocco*, 21-cr-54 (TSC), the defendant, like Weisbecker, pled guilty to violating 40 U.S.C. § 5104(e)(2)(G) in connection with spending time inside a sensitive area, the Spouse's Lounge of the Capitol. Mazzocco, like Weisbecker, took photographs of himself during the riot.  Gov. Sentencing Mem., Mazzocco, 21-cr-54, ECF No. 28 at 2, 12. Unlike Weisbecker, Mazzocco was only inside the Capitol for 12 minutes and had no criminal history or aggressive encounters with law enforcement officials after January 6. Judge Chutkan sentenced Mazzocco to 45 days of incarceration.

In *United States v. Courtright*, No. 21-cr-72 (CRC), the defendant, who pleaded guilty to violating 18 U.S.C. § 1752(a)(1), entering and remaining in a restricted building or ground, traveled to another sensitive area, the Senate Floor. Courtright observed rioters damaging property and attempting to break into locked doors, displayed a total lack of remorse in her social media posts, and falsely downplayed the violence of January 6 (including a post to Instagram with the caption "Infamy is just as good as fame. Either way I end up more known. XOXO"). Courtright was inside the Capitol for only about half as long as Weisbecker,and had no criminal history or aggressive encounters with law enforcement officials after January 6. Judge Cooper sentenced Courtright to 30 days' incarceration and a one-year term of supervised release.  *Id.*

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## V.     The Court's Lawful Authority to Impose a Split Sentence

As several members of this Court have recently determined, a sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense.  *See* 18 U.S.C. § 3561(a)(3); *see United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that " a split sentence is permissible under law and warranted by the circumstances of this case); *United States v. Smith*, 21-cr-290 (RBW), ECF 43 (D.D.C. Mar. 15, 2022) (imposing split sentence); *United States v. Meteer*, 21-cr-630 (CJN), ECF 37 (D.D.C. April 22, 2022) (imposing split sentence); *United States v. Sarko*, 21-cr-591 (CKK), ECF 37 (D.D.C. April 29, 2022) (imposing split sentence); *United States v. Entrekin*, 21-cr-686 (FYP), ECF 34 (D.D.C. May 6, 2022) (imposing split sentence); *United States v. Hemphill*, 21-cr-555(RCL), ECF Minute Entry (D.D.C. May 24, 2022) (imposing split sentence); *United States v. Buhler*, 21-cr-510(CKK), ECF 38 (D.D.C. June 1, 2022) (imposing split sentence); *United States v. Caplinger*, 21-cr-342(PLF), ECF 65 (D.D.C. June 7, 2022)

(opinion concluding that split sentence is permissible). In addition, for any defendant placed on probation, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

**A sentence imposed for a petty offense may include both incarceration and probation.**

### 1.  *Relevant Background*

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing).  That legislation falls in Chapter 227 of Title 18, which covers "Sentences."  Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment).   Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous. incarceration that exceeds two weeks[5] followed by a term of probation.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences."  Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided."  18 U.S.C. § 3551(a).  Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by

---

[5] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3563(b)(10).  *See* Part II *infra*.

29

subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[6]

As a general matter, therefore, "a judge mU.S.t sentence a federal offender to either a fine, a term

of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir.

2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of

probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced

to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant

is an individual; (2) the offense is an offense for which probation has been expressly precluded; or

(3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different

offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D.

Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight'

imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress

considered adding the following sentence to the end of Section 3561(a)(3): "However, this

paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense

if the defendant has been sentenced to a term of imprisonment at the same time for another such

offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress revised Section

3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the then-existing

language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its current form,

therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a term of probation

---

[6] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any
other sentence." 18 U.S.C. § 3551(b).

unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).

### 2. *Analysis*

Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could impose a split sentence on a federal defendant in certain cases.  *See United States v. Cohen*, 617 F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three years of probation).  In passing the Sentencing Reform Act, Congress sought generally to abolish the practice of splitting a sentence between imprisonment and probation because "the same result" could be accomplished through a "more direct and logically consistent route," namely the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583.  S. Rep. No. 225, 1983 WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") § 5B1.1, Background.  But Congress's 1994 amendment to Section 3561(a)(3) reinstated a sentencing court's authority to impose a split sentence for a petty offense.

Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . . the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense."  18 U.S.C. § 3561(a)(3).  Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b).  *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Section 3561 "begins with a grant of authority"—permitting a court to impose probation—followed by a limitation in the words following "unless." *Little*, 2022 WL 768685, at *4. But that limitation "does not extend" to a defendant sentenced to a petty offense. *See id.* ("[W]hile a defendant's sentence of a term of imprisonment *may* affect a court's ability to impose probation, the petty-offense clause limits this exception.").

It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense."  *See Little*, 2022 WL 768685, at *5-*6 (concluding that "same" in Section 3561(a)(3) functions as an adjective that modifies "offense").  Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense."  The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense."  *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012).  Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited."  *Id.* at 148-49.  And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."  *See Little*, 2022 WL 768685, at *6 (identifying other statutes and "legal contexts" with the identical phrase that carry the same interpretation).

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants.  *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense).  When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for two related reasons.

First, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.").  As noted above, when Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3).  That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases.  Scalia & Garner, *supra*, at 184.  In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense.  *Id.*  This interpretation, moreover, "ensures that *all* of Congress's goals set forth in the text are implemented."  *Little*, 2022 WL 768685, at *8.

Second, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls.  *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329.  Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail."  *Id.* at 185.  "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific

provision covers." *Id.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147 (CKK), Doc. 70, at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991 does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could

be sentenced to incarceration and supervision (in the form of probation).  No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense.  The defendant pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine.  *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### A. A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.

### 1. *Relevant background*

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation."  18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10).  Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways.  S. Rep. No. 225, 1983 WL 25404, at *98.  First, a court can direct that a defendant be confined in "split intervals" over

weekends or at night. *Id.*  Second, a sentencing court can impose "a brief period of confinement"

such as "for a week or two." *Id.*[7]

### A. Analysis

A sentencing court may impose one or more intervals of imprisonment up to a year (or the

statutory maximum) as a condition of probation, so long as the imprisonment occurs during

"nights, weekends or other intervals of time." 18 U.S.C. § 3563(b)(10).  Although the statute does

not define an "interval of time," limited case law suggests that it should amount to a "brief period"

of no more than a "week or two" at a time. *United States v. Mize*, No. 97-40059, 1998 WL 160862,

at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history described above

and reversing magistrate's sentence that included 30-day period of confinement as a condition of

probation); *accord United States v. Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18,

2011) (concluding that two 45-day periods of continuous incarceration as a condition of probation

was inconsistent with Section 3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous

60-day incarceration not appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix

months is not the intermittent incarceration that this statute permits.").  Accordingly, a sentencing

court may sentence a defendant to up to two weeks' imprisonment served in one continuous term

followed by a period of probation under Section 3563(b)(10).[8]

---

[7] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation."  S. Rep. No. 225, 1983 WL 25404, at *98.

[8] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time" does not imply that a defendant must serve multiple stints in prison.  Just as "words importing the singular include and apply to several persons, parties, or things," "words importing the plural include the singular."  1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

A sentencing court may also impose "intermittent" confinement as a condition of probation to be served in multiple intervals during a defendant's first year on probation.  18 U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539.  Notwithstanding a sentencing court's legal authority to impose intermittent confinement in this manner, the government has refrained from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic.  Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure. In any event, the government does not advocate a sentence that includes imprisonment as a term of probation in Weisbecker's case given the requested 90 days' split sentence term of imprisonment.

## VI.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Philip James Weisbecker to a split sentence of 90 days' incarceration, 36 months of probation, 60 hours of community service, and order him to pay $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his early acceptance of responsibility. Lastly, pursuant to the plea agreement, the government request at the conclusion of the sentencing hearing that the Court dismiss Counts One through Three of the Information.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

D.C. Bar No. 481052


By:      /s/ Michael G. James
MICHAEL G. JAMES
Assistant United States Attorney
N.Y. Reg. No. 2481414
Office of the United States Attorney
Eastern District of North Carolina
(on detail to the USAO-D.C.)
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Mike.James@usdoj.gov

CERTIFICATE OF SERVICE

This is to certify that undersigned counsel for the government served a copy of the

foregoing Sentencing Memorandum on counsel of record for the defendant via CM/ECF.

By:    /s/ Michael G. James
MICHAEL G. JAMES
Assistant United States Attorney
N.Y. Reg. No. 2481414
Office of the United States Attorney
Eastern District of North Carolina
(on detail to the USAO-D.C.)
150 Fayetteville Street, Suite 2100
Raleigh, NC 27601
Mike.James@usdoj.gov