**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No. 1:21-cr-000682-1(TFH)** |
| **PHILLIP WEISBECKER,** | : | |
| | : | |
| **Defendant.** | : | |

## DEFENDANT'S SENTENCING MEMORANDUM

The defendant, Mr. Weisbecker, through his attorney, Kira Anne West, pursuant to Federal Rule of Criminal Procedure 32 and 18 U.S.C. Section 3553(a), submits this memorandum to aid the Court at sentencing and hereby notifies the Court that he has received and reviewed the Presentence Report ("PSR") prepared in this case. After reviewing the PSR with Mr. Weisbecker, he has objections to the presentence report that have previously been sent to the probation officer. Mr. Weisbecker requests that this Honorable Court impose a sentence of time served to account for:

1. His lack of preparation or planning prior to January 6, 2021 to be part of the Capitol breach and his peaceful, non-destructive and non-violent behavior that day both outside and inside the Capitol building.

Mr. Weisbecker comes before the Court having plead guilty to count 4 of the Information charging him with a violation of Title 40 U.S.C. §5104(e)(2)(G).

1

A sentence of time served is a reasonable sentence that is "sufficient, but not greater than necessary" to address the sentencing factors and goals set forth in Title 18 U.S.C. § 3553(a). Under the facts of this case, such a sentence will protect the public, provide just punishment, and afford adequate deterrence.

1. **BACKGROUND**

   A. **Mr. Weisbecker was influenced and manipulated by the media, the internet, and fake news coverage of The Black Lives Matter protests of 2020**

The summer of 2020 was a violent one for major cities across the United States, in large part, due to the protests of Black Lives Matter (hereinafter "BLM"). After several months of being couped up because of Covid-19, people took to the streets to protest the horrendous murder of George Floyd. Unfortunately, across America, and including in D.C., these protests turned violent. These protests were widely televised on the nightly news and other media outlets as a necessary process for vocal opposition to systemic racism and the only way racial justice could be effectuated. Mr. Weisbecker watched from his home in Hawaii on television and on the internet as hundreds of businesses were destroyed over a period of weeks, people were injured, police were harassed, a federal courthouse in Portland was lit on fire, protestors clashed with police and eventually took over an approximate 6 block area surrounding a police precinct the police were forced to abandon in the conflict and nearly two billion dollars of damage was done by rioters

2

nationwide.   https://www.washingtonpost.com/local/dc-braces-for-third-day-of-protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-b473-04905b1af82b_story.html ;   https://nypost.com/2020/09/16/riots-following-george-floyds-death-could-cost-up-to-2b/.

The realities of these images were available for anyone watching media coverage at the time.  Depending on where one got their news in 2020, the reporting took on different tones and raised issues that were not easy for the average citizen to authenticate.  For example, there was widespread information reported on multiple media sources during 2020 that the protestors at these BLM backed riots faced **no consequences** for their behavior (emphasis added).   The reality is that thousands of protestors were arrested in the BLM protest cases, and they did face consequences.  Analysis shows that the consequences, however, were minimal for the majority of protestors rioting under the BLM cause.  A Wall Street Journal article in April of 2021 noted that in the Portland Riots that involved the destruction of a Federal Courthouse, prosecutors moved to dismiss almost half of those cases and that of the remaining cases "[t]he penalties levied so far against any federal defendants, most of whom were arrested in clashes around federal buildings in Portland including the courthouse, have largely consisted of community service, such as working in a food bank or encouraging people to vote." (Wall Street Journal, April 15, 2021 "Almost Half of Federal Cases Against

Portland Rioters Have been Dismissed". https://www.wsj.com/articles/almost-half-of-federal-cases-against-portland-rioters-have-been-dismissed-11618501979 .  Let that sink in.  BLM protestors, most of those charged in Federal court, people who attacked a Federal Courthouse and other Federal Buildings in Portland, were sentenced to "**encouraging people to vote**." (emphasis added)  Such a patently partisan punishment, thinly disguised as community service, should give every American pause.

A USA Today fact checking article from February of 2022 shows just how millions of Americans felt in reaction to the treatment of BLM protestors in 2020. USA TODAY fact checked a twitter post receiving over 5000 shares in one week stating that "BLM burned our cities and destroyed $2b of property.  They faced no consequences.  Their lawlessness celebrated and excused." https://www.usatoday.com/story/news/factcheck/2022/02/22/fact-check-thousands-black-lives-matter-protesters-arrested-2020/6816074001/  They found that statement to contain "elements of truth."  *Id.*  They confirmed from multiple sources listed in the article that insurance claims for damages related to the 2020 BLM protests totaled about 2 billion dollars.  Additionally, despite the large number of arrests surrounding the BLM protests, with estimates ranging from 14 000 – 17,000, "most of those protestors were not booked for violent crimes, but for low-level offenses such as violating curfews.  Obstructing roadways and carrying

open containers were other reasons for the arrest as well as 'failure to disperse'"
(USA TODAY, February 22, 2022 "Fact Check; Thousands of Black Lives
Matters protestors were arrested in 2020."

## B. The Big Lie used by Trump to manipulate his supporters

After the presidential election, Donald Trump (hereinafter "Trump") and his
inner circle began spreading the word that the election was "stolen" from him by
Democrats and others.   https://www.washingtonpost.com/politics/trump-election-
voter-trust/2020/12/20/00282aa6-407a-11eb-8db8-395dedaaa036_story.html.
False claims were made on media sources, as well as by the President himself, that
the election system had been corrupted and that the integrity of the election should
be questioned.   As the January 6th committee hearings this past week lay bare,
Donald Trump and his advisers knew that he had in fact lost the election but
despite this knowledge they engaged in a massive effort to spread false and
fraudulent information to convince huge portions of the US population that fraud
had stolen the election from him.  According to Representative Liz Cheney,  Vice
Chair of the House Select Committee investigating January 6, "President Trump
invested millions of dollars of campaign funds purposely spreading false
information, running ads he knew were false, and convincing millions of
Americans that the election was corrupt and that he was the true President."
https://www.npr.org/2022/06/10/1104156949/jan-6-committee-hearing-transcript

According to a Washington Post Article from June 13, 2022, many in Trump's inner circle, including White House Counsel, informed Trump that there was no basis for overturning the election results but that Trump ignored those voices.  While most of these high profile lawyers and advisers to the President testified to the January 6th committee that they told the President personally the facts about the election results and their discomfort with his claims the elections had been stolen. Most did not "correct the public record on the issue or speak out against Trump's false claims." https://www.washingtonpost.com/national-security/2022/06/13/jan-6-committee-hearings-live/  When these people failed to correct the narrative, it left a huge informational void that was filled with the likes of conspiracy theorists, online extremists and Trump loyalists willing to manipulate public opinion for their own purposes.  People like Mr. Weisbecker stood no chance at truly grasping the gravity or reality of the situation.

This Court can only understand why Mr. Weisbecker came all the way from California to D.C. to attend the Trump Rally by taking into account the enormous influence the President, the media, and the lack of accurate and truthful information played in the months leading up to January 6, 2021.  While consumption of media news is no excuse for bad behavior, it does demonstrate the powerful impact news stories, fake or real, have on the citizens of this country. The media sets the tenor for how people feel about their rights and freedoms and

can also plant notions (often false) of discontent or even outrage.  After months of watching our major cities burn, many people became convinced that vocal displays of outrage in the form of protesting was the only way to make their voices heard. Additionally, because of the widespread belief, which turned out to be true, that very few BLM supporters were being prosecuted for their criminal behavior while violently protesting, the media helped reinforce the notion that there would be little to no consequences for protestor

actions. https://www.mauinews.com/opinion/columns/2021/07/heres-why-most-arrested-rioters-will-not-be-prosecuted/;

https://www.usatoday.com/story/news/2020/06/15/criminals-used-george-floyd-protests-cover-looting-police-say/5324881002/.  As referenced earlier in this memo, the federal courthouse in Portland, Oregon was literally taken hostage by violent rioters and yet almost half of those cases were dropped and other defendants received the equivalent of a slap on the hand for their participation. Here in D.C., although hundreds, if not thousands, committed property crimes such as painting federal statues and burning and breaking into private businesses in town, the number of prosecutions was negligible.

https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.   Tucker Carlson and other conservative TV show hosts noted this on their nightly news casts which received record high audiences in 2020.

*https://www.foxnews.com/opinion/tucker-carlson-the-riots-are-not-about-george-floyd-or-racial-justice-theyre-about-trump-and-seizing-power*.

Mr. Weisbecker, like millions of other Americans, ate up the online and televised media coverage of these events in the Summer of 2020.   He saw the so called "mainstream" media label destructive and violent BLM riots as "mostly peaceful" and the protestors praised on national media outlets for their strongly held beliefs.  And while the majority of BLM protests in the summer of 2020 were, in fact, peaceful, a report studying these protests found a large number of Americans believed they were not.  The report suggested that the "disparity stems from political orientation and biased media framing such as disproportionate coverage of violent demonstrations." https://time.com/5886348/report-peaceful-protests/.



Image obtained from video clip at https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

Mr. Weisbecker similarly had strongly held beliefs after the Presidential election, mostly influenced by the President's own messaging and propaganda, that there had been irregularities in the election. He decided to come to D.C. to witness the *peaceful* protest of the results of the election and the lack of attention to alleged voting irregularities (emphasis added). A recent video released by the New York Times last week demonstrates that on January 6, there were two types of protestors there in the crowd that day.

https://www.nytimes.com/2022/06/17/us/politics/proud-boys-jan-6.html

There were ones initially who waited outside barricades and peacefully assembled with the intent just to exercise their First Amendment rights and others there with a plan  to incite the crowd and to breach the Capitol building.  The regular folks, like Mr. Weisbecker, were referred to by some of the planners, including the Proud Boys, as the "normies."  The "normies" were used as unwitting pawns in the plans of the Proud Boys and others that day.



The plan depended on  creating chaos and whipping up the "normies" into a patriotic frenzy.   The groundwork for this frenzy had been laid in the weeks before

January 6th by the Trump propaganda about election fraud and had been fueled by

Trump himself at the rally on the mall.  The Proud Boys intended to use the large

crowd to distract and overwhelm as they went to work of breaking into the Capitol.

Mr. Weisbecker had no idea he was being used as a pawn in a game far more

sophisticated and complex than anyone could imagine.    Consider that is has taken

the January 6th  House Select Committee more than a 1000 individual interviews

and 17 months of investigation, which is not yet over, to parse through to what

they feel is some truth about what transpired that day.   How could Mr.

Wiesbecker, or any "normie" that day have known what was to happen?    He

thought of himself as a witness to this injustice and the historic protest that day,

and wanted to preserve it for posterity.   Much like many of the people who

crowded Black Lives Matter Avenue in D.C. to witness historic protests but saw

violence instead.  He did not suit up for combat.  He did not obscure his face.  He

was not armed.  He wore street clothing. He did not carry anything other than a

camera.  He came alone, not as part of a group.  Mr. Weisbecker committed no

violent actions in his peaceful protest.  He did not destroy anything. His only desire

was to witness and document the protest. Unfortunately, he now understands that

going into the Capitol that day was not part of that legal democratic process, he

regrets his actions,  and he now stands before the Court after admitting to the Court

at his plea hearing that he knew going into the Capitol that day was wrong.

2. <u>**THE TRIP TO THE CAPITOL AND JANUARY 6, 2021**</u>

A. <u>**Mr. Weisbecker's trip to D.C. and his walk to the Capitol**</u>

Mr. Weisbecker believed what he read on the internet and heard from the President himself - that the election had been stolen.   He believed that there was wrongdoing in the State of Georgia. The biggest motivation for him was to see 1 million people in one place.   Importantly, Mr. Weisbecker was fixated on the *process,* not the result of the election. The emphasis on the process, and not the result, is particularly important because it shows that Mr. Weisbecker values the Constitution and the foundation of our government.  At no time did he ever think he was going to the Capitol, let alone inside the Capitol. Not until Trump's speech did he have any intention of  going anywhere other than the Ellipse area, and not being from the area or having attended a protest there before, had no real sense of where things were in relation to each other.  As the day unfolded, he never planned or  envisioned entering the U.S. Capitol.  That is, not until Trump invited everyone to march to the Capitol. Mr. followed the large crowd there that day with no intention of doing anything but having his voice join those of thousands of other peaceful protestors. Now, after seeing what really happened that day by watching film on numerous platforms, Mr. Weisbecker is ashamed of the fact that he was a part of it, albeit a small part of it compared to the many violent protesters who assaulted police officers and caused damage to the Capitol.

**B.  Mr. Weisbecker's activities inside and outside the Capitol.**

For some time, police were able to fend off the crowd, but as we now know, the Proud Boys instigated a push to overwhelm the few, undertrained, under equipped and unprepared police.[1] Officers were able to hold off the excited crowd for approximately an hour, but at 2:13 p.m., the Capitol was breached through a broken window adjacent to the Senate Wing Doors, located on the Northwest side of the building. This was several minutes before Mr. Weisbecker entered the Capitol and hundreds preceded him in entering. This breach spurred the evacuation of members of Congress and the Vice President.

Mr. Weisbecker was not in this first wave of hundreds of protesters.   In fact, the video footage shows that  he was most likely at least hundreds of  people back behind the original breach. *See*  Video Exhibit 1,  Weisbecker clip Senate door.  He could not see what was transpiring inside the Capitol. He had no idea of the violence in other parts of the Capitol. In fact,  Mr. Weisbecker had been so far behind the first people in that he had no idea how the door was opened or who opened it. He was, in his words, "following the crowd" and following others ahead of him.

---

[1] See Dmitiy Khavin, et al., Day of Rage: An In-Depth Look at How a Mob Stormed the Capitol, The New York Times (June 30, 2021), available at https://www.nytimes.com/video/us/politics/100000007606996/capitol-riot-trumpsupporters.html; see also Shelly Tan, et al., How one of America's ugliest days unraveled inside and outside the Capitol, The Washington Post (Jan. 9, 2021), available at https://www.washingtonpost.com/nation/interactive/2021/capitol-insurrection-visual-timeline/.

The confusion at this point lies between conflating *our epistemic access* of the full scope of events in their entirety with *Mr. Weisbecker's knowledge and intention* as the day unfolded.  Here, the government is arguing that every single person that was there on January 6, including Mr. Weisbecker,  knew on January 6 what the government now knows about January 6.  The government argues that Mr. Weisbecker surely knew about the violence and destruction of property when in fact he did not.  That is to say that we are conflating our knowledge of this day and the events of January 6 with Mr. Weisbecker's knowledge of the events that day.   And in this case, what matters is that though many others were violent, pushing officers, etc.,  on January 6, Mr. Weisbecker  was not violent nor did he encourage others to be violent.   He carefully observed the situation around him, and acted peacefully (as shown in the videos). This is the sandbox we have to work in.

The only thing that matters is what Mr. Weisbecker knew at the time he was at the Capitol. What did he know? What were the driving factors that led him to do what he did?  What should  matter to this Court  is what Mr. Weisbecker  did and how he acted.  The gov't makes another mistake-the composition fallacy. That is, when you conflate the attributes of the whole with the attributes of the parts. The

government argues that my client has all the same properties as the mob but that is factually incorrect as explained, *infra.[2]*

As he entered the Senate wing door, people around Mr. Weisbecker began to engage peacefully.  He heard people shouting "they are letting us in." This was approximately 100 yards from the door.  The mood was not unlike other protests in Washington, D.C. and many around took selfies and appeared peaceful with cameras and flags. Mr. Weisbecker  did not observe any destruction or bad behavior towards the police at this time. He walked down a long hall. From there, he  turned around and went upstairs after hearing another person direct him up the stairs. Then he found himself right at Nancy Pelosi's outer offices.

When Mr. Weisbecker saw police officers moving protesters out of the Rotunda, Mr. Weisbecker left.  Mr. Weisbecker was completely peaceful in all his actions.   *See* Rotunda North video, (aka 0960IUSCD 02 Rotunda North-2021-01-06_15H00MIN000S000MS). He enters the Rotunda at 1:59 seconds.     Mr. Weisbecker heard there was a curfew, immediately went back to his airbnb, spent the night and flew home the next day. The statement of offense lacks any facts of any violent or destructive behavior on the grounds or inside the Capitol. *See* Statement of Facts, ECF # 27.

### C. **Hindsight is 20/20.**

---

[2] An exhibit folder will be set up by the AUSA hopefully by June 21, 2021. The filing due date is a federal holiday and therefore counsel will contact the Court for direction on filing video exhibits.

Now, in retrospect, Mr. Weisbecker wishes he'd never come to D.C. at all, which is terribly sad because D.C. is incredible in so many ways.  He never imagined going inside the Capitol and certainly never thought that violence would follow.   Importantly, Mr. Weisbecker did not have any intention of stopping the vote.  Indeed, Mr. Weisbecker's aimless following of the crowd through the Capitol that day is evidence of his lack of intent to do something in the Capitol that day, his lack of understanding where he was in the Capitol, and his herd mentality, rather than a desire to execute a plan to stop the vote that was taking place in the Senate. But if his purpose in demonstrating was to stop the vote, he showed no efforts at all to execute that plan.  He respected the police officers he encountered and he proceeded out of the building peacefully when shown the way.  This shows that he had no intention of stopping the vote, but merely to document the event along with many others walking in the Capitol that day.

### D. The Charges and the arrest of Mr. Weisbecker

On November 18, 2021, a criminal complaint was filed in U.S. District Court for the District of Columbia charging Mr. Weisbecker with four misdemeanor offenses related to his conduct on January 6. *See* ECF No. 14.[3]   He was arrested October 21, 2021, and was released on a PR bond. *See* ECF # 11.

---

[3] Those four charges are: (i) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (ii) Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2); (iii) Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); and (iv) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

Mr. Weisbecker appeared before this Honorable Court for arraignment via video conference and entered a plea of not guilty. He later entered a plea of guilty again via video conference before this Honorable Court. *See* ECF # 26 .

When Mr. Weisbecker was arrested on this case,   it was at a government checkpoint  in Jumul.  (Before this, Mr. Weisbecker from February 9, 2021 to September 2021, he was arrested at the international border in Tecate at least 8 times).  He was questioned by several task force officers and additional officers that arrived on the scene.  He was chained to a wall in a small jail for three hours and then transferred to FBI Headquarters in Sorrento Valley, California. He stayed in that lockup for 7 days and was represented by two different federal public defenders.

### 3.  LEGAL STANDARD

Section 3553 of Title 18 of the United States Code enumerates certain factors a district court is to consider when sentencing a defendant who has been convicted of a federal offense.   Primarily, the court shall consider the nature and circumstances of the offense and the history and characteristics of the defendant. *See* 18 U.S.C. § 3553(a)(1). The court shall also consider the need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, and provide just punishment; afford adequate deterrence to criminal conduct; protect the public from further crimes of the defendant; and provide defendant with needed

educational or vocational training, medical care, or other correctional treatment in the most effective manner. *Id.* at § 3553(a)(2)(A-D).  Section 3553(a) further sets forth the factors that the Court must consider in fulfilling this provision:

1.   The nature and circumstances of the offense and the history and characteristics of the defendant;
2.   The need for the sentence imposed;
3.   The kinds of sentences available;
4.   The kinds of sentence and the sentencing range…;
5.    Any pertinent policy statements issued by the Sentencing Commission;
6.   The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and
7.   The need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a)(1-7).

## 4.  FACTORS CONSIDERED PURSUANT TO 18 U.S.C. §3553(a)

At sentencing, a district court must impose a sentence that is "sufficient, but not greater than necessary" in light of the factors identified in §3553(a).   *United States v. Mendoza-Mendoza*,  597 F.3d 212, 216 (4th Cir. 2010), *citing Kimbrough v. United States*, 552 U.S. 85, 111 (2007)(quoting §3553(a)).

### A. Nature & circumstances of the Offense & the History and Characteristics of Mr. Weisbecker

After Mr. Weisbecker walked freely into the Capitol on the side with the scaffolding, he was in awe. Compared to many other class B misdemeanor cases that have been filed in this Court, Mr. Weisbecker's conduct is at the bottom of the scale.  First, the defense is not aware of any evidence that defendant's entry into

the Capitol was preplanned or coordinated with anyone else, including any

extremist or organized groups. His intention was to document and photograph the

historic rally and that did not include going into the Capitol.  Second, the defense is

not aware of any evidence that the Defendant incited others to commit acts of

violence or destruction.  He didn't engage in any chanting such as "where's

Nancy" or "hang Mike Pence." Third, the defense is not aware of any evidence that

the Defendant engaged in any violence or questionable conduct towards law

enforcement. In fact, it's just the opposite.  He treated all officers that day with

respect.  Fourth, the defense is not aware of any evidence that Mr. Weisbecker

destroyed or stole any property from the Capitol. Fifth, based on the Government's

investigation, it appears that he remained in  limited parts of the Capitol building

for a limited period of time – i.e., in one hallway for a several minutes, and in the

Rotunda area for around  30 minutes. The defense is not aware of any evidence

that Mr. Weisbecker entered any rooms or offices in the Capitol, any personal

space or the Senate or House Chamber, with the exception of a few seconds in the

farthest outer office of Nancy Pelosi. He went in, saw where he was, and turned

around and walked out.

   To his credit, Mr. Weisbecker  spoke to the officers and  FBI freely when he

was arrested.  He fully acknowledged  his misconduct by answering pointed

questions by the FBI task force and agents, and contrary to what the government

says, he  expressed true and full contrition.  (He told his pretrial services officer, Angelika Fisk, San Diego division, from the very beginning that he regretted ever coming to the protest).  He was relieved by the opportunity to take responsibility for his actions.  He has not one time had any violations of his conditions of release.

Mr. Weisbecker did not come to Washington with the intention of subverting democracy. Mr. Weisbecker came to Washington to document the peaceful protest and witness one million people in one place  and what he believed at that time to be a fraudulent election.   By the time Mr. Weisbecker arrived at the U.S. Capitol after 2:00 p.m., many of the barriers that had been erected along the perimeter of the building were no longer present. Mr. Weisbecker met no resistance in his walk to and inside the Capitol. At the time,  Mr. Weisbecker didn't dream he'd be charged for going into the Capitol.[4]  After seeing the  video footage showing protestors beating police officers, spraying gas in their faces, screaming obscenities, and destroying property, it made Mr. Weisbecker cringe. He did not witness any of  this at all. He is left with deep regret, fear, shame, and remorse.

The government must concede that Mr. Weisbecker committed no violent acts, destroyed no property, and did not coordinate with anyone. His actions within

---

[4] Notably, the Department of Justice has declined to bring criminal charges against the speakers or organizers of the rally; the only legal actions initiated against them being civil in nature. *See Thompson et. al., v. Trump et. al.*, 21-cv-00400, ECF No. 1 (Feb. 16, 2021); *Swalwell v. Trump et. al.,* 21-cv-00586, ECF No. 1 (Mar. 5, 2021); *Smith et. al. v. Trump et. al.,* 21-cv-02265, ECF No. 1 (Aug. 26, 2021). .

the Capitol have been tracked on the CCTV footage and this demonstrates that while unlawfully present in the Capitol with no excuse, he did not destroy property, steal property, commit violent acts, or encourage others to do so. He entered and exited through doors. And when he spoke to police officers, it was non-confrontational and respectful. Despite his overwhelming and continuing cooperation with the government, the government now seeks to minimize his acceptance of responsibility because he does walk "in lock step" with the government's theory regarding each and every fact and the reason for each and every action he took on January 6th. The government's position hardly sets an example for those in the future who would seek to "do the right thing" by offering to cooperate and plead guilty in an early, timely matter such as the instant one.

This has been a long road for Mr. Weisbecker and his family. Fortunately, he has a supportive relationship with his immediate family who has stood by him since the beginning of this case and a supportive extended family and friends. Mr. Weisbecker pled guilty at an early stage in the proceedings thus saving valuable judicial resources. He didn't file one motion in his defense. It is of utmost importance to him that this Court understand that he is incredibly remorseful for his actions on January 6, 2021.. He has endured life-long damage to his reputation. He was fired from his largest client and his income was shattered. He has been berated and harassed by law enforcement when legally crossing the border. Unbelievably,

Mr. Weisbecker has been tracked as if he worked for the Cali Cartel as their top smuggler. At his previous address, he was under surveillance for at least a month by the FBI, sometimes by 5 agents at a time. He was followed when he left the house. A plane was sent up over his home, and he was tracked and stopped every time he came across the border. He was followed  So were his friends and work colleagues. As the PSR notes, he bought land in Mexico and works there so needs to travel across the border, which for states like California, Arizona and Texas, is normal behavior. But here, his treatment was anything but normal. He was constantly under the microscope and harassed with his participation in January 6 as the cover for their drug investigation.[5]

 Moreover,  none of this will be erased from the internet. It's there forever.  He has fully accepted responsibility for his bad judgement in entering the  Capitol building by pleading guilty in what can be described as the "middle wave" of defendants that pled guilty, only because that's when he was charged.  He has been the subject of a number of media accounts lumping him with others that were there on January 6, 2021. His personal character and reputation will forever be tarnished.  Still, he has had minor trouble with the law.

---

[5] Undersigned counsel makes this case in good conscience as she prosecuted many cartels as an AUSA in Houston, Texas for 9 years and has defended many different cartel members as a defense attorney. This was no January 6 investigation-this was the FBI trying to make a drug case. Seems similar to the government getting a warrant on Carter Page to get to President Trump. *See* Judge Collyer's opinion, *In re Accuracy Concerns Regarding FBI Matters*, 411 F.Supp 3d 333 (Foreign Intel. Serv. Ct. 2019).

Mr. Weisbecker does not seek to minimize the harm caused by his behavior by the explanations in this sentence memo. Nonetheless, in determining what punishment is warranted, this Court should not lose sight that he did no harm, intended no harm, and regrets that he was even there. He didn't post anything violent but on the contrary made and posted one video showing people protestors set to calm meditation music pondering our democracy.[6] *See* Freedom protest video. Most telling about Mr. Weisbecker is despite all he has been through, he has been a model person while on pretrial release, is working full time again after losing numerous clients and has transitioned his job prospects as best he can with the law enforcement harassment at the border. As noted in the PSR, Mr. Weisbecker has had some minor bumps in the road, but he has proven to be a hard worker and a loyal son and brother. His post arrest behavior shows that he is capable of being a productive citizen and the Court can rely on that as a basis to sentence him to a term of probation considering the 3553 factors.

Attached to this memo is a letter from Mr. Weisbecker and a friend of his. *See* Defendant's Exhibit 1. Respectfully, these letters illustrate that a sentence of time served is appropriate in this case.

## B. Need for the Sentence imposed

### 1. General deterrence – 18 U.S.C. § 3553(a)(2)(B) – to adequately deter others from criminal conduct

---

[6] Undersigned counsel is working with the government to determine where some of the photos came from.

The purposes of sentencing include punishment, rehabilitation, general deterrence, specific deterrence, and incapacitation. In this case, there appears to be no need for incapacitation, specific deterrence or rehabilitation.  The public will be adequately deterred by the sentences meted out against those who perpetrated the violence and mayhem at the Capitol and the negative publicity and collateral consequences attendant to even a misdemeanor conviction for those involved. Those who would not be deterred by these consequences are likely not deterrable. And, a sentence that includes more incarceration for someone with a job when other reasonable alternatives exist would not promote respect for the law. Indeed, unnecessarily harsh sentences imposed upon those who were less culpable will not encourage respect for the law or promote just punishment, but are likely to  be counterproductive, and labeled as political posturing.  A period of  time served does constitute punishment  and will deter others as one's liberty interests are curtailed by travel restrictions, reporting obligations, and limitations on one's personal freedoms. The National Institute of Justice, Department of Justice, issued a summary of the current state of empirical research stating that "prison sentences are unlikely to deter future crime," and "increasing the severity of punishment does little to deter crime."  U.S. Dep't of Justice, Office of Justice Programs, Nat'l Inst. of Justice, *Five Things to Know About Deterrence* (July 2014) (relying on Daniel

S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Justice in America

199 (2013)), available at https://ncjrs.gov/pdffiles1/njj/247350.pdf.

## 2. Specific deterrence – 18 U.S.C. § 3553(a)(2)(C) – to protect the public from further crimes of the defendant

Mr. Weisbeckers likelihood of recidivism is very low. He has expressed

genuine remorse and contrition, has cooperated fully with law enforcement,  turned

over evidence voluntarily, given information to the FBI and  accepted the first plea

offer tendered with no hesitation. His acceptance of responsibility was complete

and without reservation. He has never tried to minimize his behavior.  Research

has consistently shown that while the certainty of being caught and punished has a

deterrent effect, "increases in severity of punishments do not yield significant (if

any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of*

*Sentencing,* 34 Crime & Just. 1, 28 (2006)" Three National Academy of Science

panels… reached that conclusion, as has every major survey of evidence." *Id*.; See

*also* Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm:*

*Restorative Justice and Sentence Severity: An Analysis of Recent Research (1999),*

summary available at http://members.lycos.co.uk/lawnet/SENTENCE.PDF. The

report, commissioned by the British Home Office, examined penalties in the

United States as well as several European Countries. *Id*. at 1. It examined the

effects of changes to both the certainty and severity of punishment. *Id*. While

significant correlations were found between the certainty of punishment and crime rates, the "correlations between sentence severity and crime rates…were not sufficient to achieve statistical significance." *Id*. at 2. The report concluded that the "studies reviewed do not provide a basis for inferring that increasing the severity of sentences is capable of enhancing deterrent effects." *Id.* at 1. Given Mr. Weisbecker's age (51), and other issues consistent with what is mentioned above, the likelihood of him ever re-offending is as close to zero as one might come. A punishment of any jail time in this case is going to have the exact opposite effect than what is in the interest of justice. The alternatives to incarceration make financial sense, conserve bed space for individuals from which society would need greater protection and would serve the ends of justice. Mr. Weisbecker urges the Court to impose a sentence of time served, his sincere and complete remorse, his early and consistent acceptance of responsibility, and the lack of a need to further deter him.[7]

### C.  The kinds of sentences available

The sentencing guidelines do not apply in this case. The Court should not consider any conduct that Mr. Weisbecker did not plead guilty to. If this Court were to adopt the government's recommendation, as opposed to that of the

[7] For those in a Criminal History Category I, the recidivism rate is 15.2%. For those who have been employed, the rate is 12.7%; and for those who were ever married, the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half those who have a drug history. *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at 29 (May 2004).

Probation Office and/or defense counsel, it would result in sentencing disparity with other individuals who were similarly charged and behaved similarly. _See infra_.[8] The probation officer states in the recommendation that Mr. Weisbecker acted "with the intent to impede, disrupt, and disturb the counting of electoral votes by the joint Congress." *See* ECF #29, p. 2.  This is patently false and there is no evidence that suggests this. He wasn't even charged with 18 USC 1512.

Imposition of a fine is discretionary, and, defendant respectfully submits, should not be ordered in this case.  Defendant's financial condition is such that he cannot pay any significant fine.  *See* PSR, paragraphs 114, 117; U.S.S.G. **§ 5E1.2(a)** (fine not recommended if defendant unable to pay).

### D. The need to avoid unwarranted sentence disparities

If this Court were to impose a sentence greater than time served and restitution, it would create an unwarranted sentencing disparity compared to similar cases that have already gone to sentencing in this Court.  The following cases are a sampling where a misdemeanor was charged and pled to and resulted in no incarceration:

\*\**United States v. Anna Morgan-Lloyd,* 21-cr-00164 (RCL) (Jun. 28, 2021) (sentenced to probation);
\*\**United States v. Danielle Doyle*, 21-cr-00324 (TNM)(Oct. 1, 2021) (sentenced to probation even though she entered through a broken window and yelled at police officers);

---

[8] This does not include every case, just a sampling.

\*\**United States v. Valerie Ehrke*, 21-cr-00097 (PLF) (Sept. 17, 2021) (sentenced to probation);

\*\**United States v. Jessica Bustle and Joshua Bustle,* 21-cr-00238 (TFH), ECF Nos. 42 & 44 (sentenced to supervised release with home confinement even though Ms. Bustle 1) posted on social media that Mike Pence was a traitor, 2) denied media accounts of violence were accurate, minimized the conduct of all of the rioters, 3) called for a revolution even after the events of January 6, 4) encouraged the rioters to be proud of their actions, and 5) minimized the impact of that day on lawmakers and democracy. *See United States v. Jessica and Joshua Bustle*, 21-00238 (TFH). Judge Hogan imposed a probationary sentence with a short period of home confinement for Ms. Bustle and an even shorter period of home confinement for Mr. Bustle. The government recommended probation in this case.

\*\**United States v. Andrew Bennett,* Crim. No. 21-227 (JEB)(sentenced to three months home confinement and two years probation). According to the government, who recommended probation with a short term of home confinement*,* Mr. Bennett espoused conspiracy theories about the election, was an admirer, albeit not a member of the Proud Boys, and boasted about his conduct. According to the government, Mr. Bennett did not come to the rally in D.C. on a whim, but rather planned it for months. He posted numerous times about conspiracy theories and a fraudulent election. On January 4, 2021, he posted to his Facebook page, "You better be ready chaos is coming and I will be in DC on 1/6/2021 fighting for my freedom!". On January 6, according to the government, Bennet began livestreaming video to his Facebook page from outside the Capitol as early as 1:00 p.m. He was in the middle of the growing crowd on the West Front of the Capitol, where some taunted police officers and sporadically threw objects at them. The government alleges that someone near Bennett exhorted others to "move forward" and that Bennett yelled at a police officer. Bennett also filmed assaults on the police officers and continued to livestream events inside the building.

None of this is to suggest that Mr. Bennett should have received a sentence of incarceration, only to suggest that the distinctions the government draws are hard to justify. There is nothing materially different about Mr. Weisbecker or his conduct that would justify a sentence of incarceration and  such disparate treatment. The courts have sentenced some January 6 misdemeanor cases to

incarceration, but the nature and circumstances of those offenses, as well as the history and characteristics of the defendants in those cases, can be distinguished.

In *United States v. Derek Jancart and Erik Rau*, 21-cr-00467, the Honorable Judge Boasberg sentenced both defendants to 45 days of incarceration. However, in that case, unlike Mr. Weisbecker's, the prosecutors asked for four (4) months of incarceration for each defendant, citing that the men came to D.C. with gloves, a gas mask, and two-way radios. *Id.* Additionally, Mr. Jancart posted a video on Facebook during January 6, where he is heard laughing at police while Mr. Rau screamed, "We have you surrounded!" Additionally, Mr. Rau, unlike Mr. Weisbecker, was on probation at the time of his offense on January 6 for domestic violence. Additionally, Judge Chutkan  recently sentenced another January 6 defendant to 45 days of incarceration in *United States v. Matthew Mazzocco*, 21-cr-00054 (TSC)(October 4, 2021). However, Mr. Mazzocco deleted his social media accounts in an effort to obscure his actions, and refused to give law enforcement access to the body-worn camera he wore that day, claiming that he did not know where it was. https://www.washingtonpost.com/dc-md-va/2021/10/04/capitol-riot-jail-deter-mazzocco/ In *United States. v. Reeder*, 21 CR 166(TFH), this Court sentenced Mr. Reeder to 90 days incarceration because he bragged on social media about having engaged in battles with the police inside the Capitol, showed no remorse or contrition, claimed he had no idea he could not be in the Capitol despite being tear-gassed, recorded

attacks on police officers inside the Capitol, entered a second time *by forcing himself past police officers who were trying to clear the Capitol*, posted videos bragging about his actions and deleted social media accounts, and most importantly, put his hands on a police officer.   Even after pleading guilty, according to the government, he portrayed himself as an innocent victim of circumstances.

 In *United States. v. Baker*, 21 CR 273(TFH), this Court sentenced the defendant to 9 days intermittent incarceration "when he chose to remain in the Capitol despite watching police attempt to expel rioters from the building", ECF #34, p.2, he live streamed the event and also dictated what was happening in real time and staying in the building even though police told the crowd to leave the Rotunda. These are factors more aggravating than that of Mr. Weisbecker.

　　Mr. Weisbecker was far more cooperative with law enforcement, did not attempt to hide or destroy any evidence and agreed to meet with law enforcement and debrief about January 6  (as stated in his plea agreement) and he was not ever asked to do so.   All told, the facts of the offense conduct and characteristics of the defendants who garnered incarceration were starkly different than Mr. Weisbecker's conduct and characteristics.

## 5. CONCLUSION

Considering all the applicable factors the Court will consider, Mr. Weisbecker respectfully moves this court to impose a sentence of time served with 40 hours of community service.  This sentence  is "sufficient but not greater than necessary" as required by 18 U.S.C. §3553(a).  It would be a sentence in the best tradition of federal judicial discretion, that would consider Mr. Weisbecker  as an individual and account for his unique failings and positive attributes that, in the words of Justice Kennedy "sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Rita v. United States*, 551 U.S. at 364, (Stevens, J. concurring), *citing Koon v. United States*, 116 S.Ct. 2053 (1996).

                           Respectfully submitted,

By:      _____/s/_____
           KIRA ANNE WEST
           DC Bar No. 993523
           712 H. St NE, Unit #509
           Washington, D.C. 20005
           Phone: 202-236-2042
           kiraannewest@gmail.com

CERTIFICATE OF SERVICE

I hereby certify on the 20th  day of June, 2022 a copy of same was delivered
to the parties of record, by ECF pursuant to the Covid standing order and the  rules
of the Clerk of Court.

_____/S/
Kira Anne West